**EDGAR LAW GROUP, LLP**
Ronda N. Edgar #234758
675 North First Street #550
San Jose, CA 95112
Telephone (408) 278-1200
Fax (408) 278-1211
E-mail: info@edgarlawgroup.com

Attorney for Debtor and Plaintiff

U.S. BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In Re:<br><br>DAVID S. MOLINA,<br><br>　　　　　　　Debtor.<br><br>DAVID S. MOLINA<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>U.S. DEPARTMENT OF EDUCATION<br><br>　　　　　　　Defendant | Case No.: 21-51425<br>Adversary No.: 22-05008<br><br>AMENDED ADVERSARIAL COMPLAINT TO THE DISCHARGE OF THE DEBTOR AND TO DETERMINE THE DISCHARGABILITY OF STUDENT LOAN DEBT<br><br>**CHAPTER 7**<br><br>Date: May 19, 2022<br>Time: 01:30 PM<br>Rm:   Via Tele/Videoconference |

By and through his attorney, DAVID S. MOLINA, Debtor and Plaintiff (Collectively, "Debtor") hereby alleges. Debtor respectfully submits herein this amended adversarial complaint to discharge of his student loan debt, based on allegations described herein against creditor and third-party beneficiary of creditor, and due to undue hardship as follows:

**I.**

**PARTIES**

1.　Debtor filed the Chapter 7 Petition in November 2021 herein.

**Adversarial Complaint to Dischargeability**　　　1
*Molina v. US Department of Education*

Case: 22-05008   Doc# 6   Filed: 03/17/22   Entered: 03/17/22 20:44:31   Page 1 of 17

2. Defendant, United States Department of Education, also known as "DEPARTMENT", is a governmental unit which provided student loans to Debtor, and serviced by FedLoan Servicing (FEDLOAN), also known as "Federal Loan Servicing", which is operated by Pennsylvania Higher Education Assistance Agency ("PHEAA"). FEDLOAN is a student loan servicer for both federal and private student loans that is operated by PHEAA, a nonprofit that provides financial aid services and administers several state grant programs. DEPARTMENT provided student loans to Debtor all within the definition of 28 USC §523(a)(8).

3. This amended complaint shall remove FEDLOAN as the defendant in this case because they are solely the servicer of the student loans issued by DEPARTMENT to Debtor. This amended complaint shall add DEPARTMENT as the correct defendant to this case, because they are the note holder and issuer of the student loans to Debtor.[1]

4. This is a core proceeding under 28 USC §157(b)(2)(I). Jurisdiction arises under 8 U.S.C. §1334.

5. Venue arises under 28 U.S.C. §1408.

6. Listed herein are the student loan agreements between Defendant and Debtor, described as "Department Loans":

    a. DEPARTMENT 1 - In [2015], Debtor entered into a federal student loan agreement with DEPARTMENT (Loan Number xxx-xx-0002). The original loan amount is recorded as $ 436,653.00. Currently, there is a

---

[1] See, In re Bennett, No. 14-51218, 2015 WL 5602881, at *2 (Bankr. M.D.N.C. Sept. 22, 2015) (granting motion to dismiss filed by PHEAA d/b/a FedLoan) ("While the Court is not unsympathetic to the Plaintiff's desire to obtain information about his student loan, a cause of action under § 523(a)(8) against the loan servicer is not the appropriate procedure in which to do so."); In re Hubbard, No. 13-15606, 2014 WL 1654703, at *4 (Bankr. E.D. Tenn. Apr. 25, 2014) (granting PHEAA's motion to dismiss) ("…the Debtor has sued the wrong party in suing the servicer of his student loan, rather than the owner or guarantor of the loan.").

Adversarial Complaint to Dischargeability    2
*Molina v. US Department of Education*

Case: 22-05008   Doc# 6   Filed: 03/17/22   Entered: 03/17/22 20:44:31   Page 2 of 17

balance of approximately $435,653.00 due and owing from Debtor to DEPARTMENT.

7. The loans referenced in paragraph 5 above were incurred for educational loans as described in 11 U.S.C. §523(a)(8) and the cases arising thereunder. The Loans are listed as creditors on Schedule F and notice of the filing of Debtor's petition herein has been served on the Defendant.

8. As filed in a separate adversary complaint, DEPARTMENT is advised herein that in between the years of 2002 and 2005, Debtor entered into five (5) student loan agreements with Defendant Navient Education Loan Corporation, also known as, "Navient Corporation") (collectively, "NAVIENT. The original loans, and each of the respective amounts are described "Navient Loans 1-5": recorded as follows:

    a. Navient Loan 1 - In [2004], Debtor entered into a student loan agreement with NAVIENT (Loan Number xxx-xx-2635). The original loan amount is recorded as $ 51, 826.00. Currently, there is a balance of approximately $42, 416.00 due and owing from Debtor to NAVIENT.

    b. Navient Loan 2 - In [2005], Debtor entered into a student loan agreement with NAVIENT (Loan Number xxx-xx-2650). The original loan amount is recorded as $ 62, 238.00 Currently, there is a balance of approximately $49, 572.00 due and owing from Debtor to NAVIENT.

    c. Navient Loan 3 - In [2002], Debtor entered into a student loan agreement with NAVIENT (Loan Number xxx-xx-2601). The original loan amount is recorded as $ 43, 179.00 Currently, there is a balance of approximately $38, 191.00 due and owing from Debtor to NAVIENT.

        d.        Navient Loan 4 - In [2004], Debtor entered into a student loan agreement with NAVIENT (Loan Number xxx-xx-2627). The original loan amount is recorded as $ 32, 384.00 Currently, there is a balance of approximately $27,049.00 due and owing from Debtor to NAVIENT.

        e.        Navient Loan 5 – In [2004], Debtor entered into a student loan agreement with NAVIENT (Loan Number xxx-xx-2643). The original loan amount is recorded as $ 28,451.00 Currently, there is a balance of approximately $23,285.00 due and owing from Debtor to NAVIENT.

9.      The "Loans" from NAVIENT were also incurred for educational loans as described in 11 U.S.C. §523(a)(8) and the cases arising thereunder. The Loans are listed as creditors on Schedule F and notice of the filing of Debtor's petition herein has been served on the Defendant.[2]

## II.

## THE MATERIAL FACTS ESTABLISH THAT DEBTOR WILL SUFFER UNDUE HARDSHIP

A.      Debtor seeks to file the herein adversary proceeding against Defendant pursuant to 11 U.S.C. § 523(a)(8) for the purpose of establishing that his student loans should be deemed dischargeable and discharged as a matter of law. In sum, as the material facts pertaining to Debtor's disabilities and limited opportunities to earn, as well as Debtor's financial disposition, both individually, and even considering the income of Debtor's spouse, conclusively establish that Debtor is entitled to the relief requested, i.e., the discharge of his student loans, pursuant to

---

[2] Navient made student loans to Debtor, all within the definition of 28 U.S.C. §523(a)(8). This is a core proceeding under 28 USC §157(b)(2)(I). Jurisdiction arises under 8 U.S.C. §1334. Venue arises under 28 U.S.C. §1408.

the applicable three-prong *Brunner*[3] undue hardship test, and that as a matter of law (See Section III below).

      B.     Debtor is married and has a son with severe autism. He graduated from the College of Notre Dame, December 2000 with a Bachelor of Arts in Psychology. Debtor subsequently obtained admission to the Institute of Transpersonal Psychology (ITP), now Sofia University (hereinafter "ITP" or "University" interchangeably) in 2001 and graduated with a master's degree in psychology. Debtor also received a Doctorate in Clinical Psychology in December 2014, from University.

      C.     From 1989 to 2013, Debtor entered separate student loans notes, which have been consolidated into one Department and Navient Loans 1-5 (See Section I, Paragraph 5 above). It should be noted that these loans were incurred over such a long period of time because Debtor's learning disabilities were of severe nature, which led Debtor to spend over 2 times the normal length of time in school to obtain his Ph.D. (13 years of post-graduate academics for Debtor as opposed to the normative 6 years).

      D.     Because of the circumstances surrounding Debtor's disability that contributed to the length of time Debtor took to complete his degree's, the University proceeded to urge the Debtor to take out additional loans to cover his school tuition.

      E.     Moreover, the University made false promises to the Debtor regarding its ability to ensure that the Debtor would be able to acquire all the internship hours necessary to obtain professional standing, failing to appraise the Debtor of the fact that the nature of Debtor's learning disabilities would effectively negate Debtor's possibilities of achieving the same. At the Debtors peril, the Debtor proceeded with taking out additional loans based on the false promises that the University made to Debtor and which he relied

---

[3] Brunner v. New York State Higher Education Services Corp., 831 F.2d 395 (2d Cir. 1987)

upon. Simply stated, Debtor would never have taken out the additional loans he did had the University not made false promises to the Debtor concerning Debtor's internship, employment and earning prospects.

  F. All six (6) stated notes as referenced above are educational loans as defined in 11 U.S.C. § 523(a)(8) and were incurred for higher education expenses.

  G. The total original balance of all student loans outstanding is approximately $616,167.00. The interest rates on the student loans range from [3.25%] to [5.150%]. Debtor's student loan obligations to [DEPARTMENT or NAVIENT], in the amount of [$435,653.00 or $218,078] are that of which Debtor is seeking the stipulations.

  H. Over the past 10 years, Debtor has sought deferment due to his inability to pay any amount on the student loans. Since [August 1, 2013] and as a result of Debtor's ongoing desperate attempts to repay his student loans, Defendant has granted Debtor part-time deferments, temporary forbearances, and forbearances on all notes.

  I. During the years of February 2007 through August 2013, Debtor worked for Janus of Santa Cruz Community Clinic (hereinafter "Janus Clinic"). Janus Clinic is an out-patient, medically assisted, harm reduction drug abuse treatment center providing methadone a buprenorphine treatment. While still enrolled in school, between August 2013 and October 2013, Debtor worked as a Psychologist Intern at New Directions Adolescent Services in Santa Rosa, California. New Directions is a private school that enrolls about 30 mentally ill children ages 12-18. From December 2013 to November 2016, Debtor returned to work as a Chemical Dependence Counselor / Internship Supervisor, at Janus Clinic. In November 2016, Debtor was laid off from that position. Debtor asserts that Debtor's disabilities hindered Debtor's ability to perform to professional (or) market standards which resulted in Debtor being fired from Janus Clinic. In June 2017, Debtor was placed on Disability due to him being diagnosed

with Post Traumatic Stress Disorder and Chronic Idiopathic Urticaria and an established 100% disability level.

J. Currently, Debtor is managing his health by himself and is the primary caretaker for his son. Circumstances surrounding Debtor's son's needs have made it difficult for both the Debtor and Debtor's spouse to be employed full time, as both of their attention is needed at home.

K. A summary of Debtor's income since having earned his doctorate degree in December 2013 is as follows: From 2013, when Debtor received his doctorate degree through present, Debtor's average annual gross income has never exceeded $35,175.20 (which equates to $2,931.27 monthly). Debtor lives in an area where a low six-figure income family of three is effectively considered to be part of the "working poor". His income has been hindered by the fact that he has not been able to acquire his clinical internship hours in order to satisfy the requirements toward a license to practice as a clinical psychologist. Employers are reticent to hire Debtor as his disability hinders his ability to perform required work-related tasks anywhere near as efficiently as other applicants; a field where public or publicly funded employers receive payment for services on a per diem basis. Simply stated, where an employer can process 4 patients per day with one intern applicant, Debtor's disabilities make it difficult for him to process one in the same amount of time. Pragmatically, the prospective employer's is likely to receive only one quarter of the return on monies invested on Debtor as they would with a typical employee. With this knowledge, prospective employers simply will not hire Debtor.

1. Debtor's current income and household expenses are as detailed in the bankruptcy petition affiliated with the complaint (Exhibit A – Schedule I and J).

2. Debtor is 53 years old with no prospect of employment, given his current disabilities.

3. In October 2016, Debtor was constructively terminated from his job at Janus of Santa Cruz, where he has worked as an entry-level drug counselor with a doctorial degree.

4. In June 2017, Debtor was placed on Disability based upon the fact that his disabilities prevent him from performing his employment duties with anywhere near the degree of standard professional efficiency required of interns in his field. Debtor's inability to obtain and maintain a position as an intern has in turn rendered him unable to secure meet the intern-hours requirements necessary for Professional Licensure as a psychologist.

5. Based on the foregoing and in light of the fact that the educational institution he attended knew or reasonably should have known that it would be effectively impossible for Debtor to meet the intern-hours requirements, Debtor has instituted a series of educational claims against University. These claims are based on the fact that there were ongoing failures by the institution to make reasonable accommodations for him. The University failed to provide the Debtor with truthful information considering the fact that he would almost assuredly be unemployable after obtaining his degree. Clearly, their actions have attributed to Debtor's current financial predicament.

6. Debtor incurred student loan debt, based on promises made to him by University. Debtor fully relied upon these promises to his detriment, and that of his families. The University knew or reasonably should have known that Debtor's disabilities would preclude him from the benefit of the bargain he made with the University, i.e., the promised ability to obtain a professional internship that would in turn allow him to obtain the professional licensure and economic privileges implicit in his agreements with the University.

7. As a result, Debtor has been limited in his ability to professionally advance in the licensed-driven field for which he obtained his PhD.

8. Debtor's average annual gross income for five years (2012-2016) after spending twenty-four (24) years in both undergraduate and graduate school, obtaining a PhD degree from University has never exceeded $35,175.20 ($2,931.27 monthly). Debtor's wages were earned in a geographic area where a low six-figure income for a family of three is rendered part of the "working poor."

9. 2016 (Last year of Debtor's employment) - Debtor's 2016 annual adjusted gross income was $36,043.00, or monthly income of $3,003.58. While Debtor's spouse is not part of the Bankruptcy proceeding, her adjusted gross monthly income was $3,451.83. Combined, their adjusted gross monthly income in 2016 was $6,455.42. With a gross income of $6,455.42, Debtor was still unable to meet their basic living expenses.

10. Debtor's monthly expenses far exceed his gross income at $6,455.42. Without adding any additional expenses, Debtor's rent and childcare accounted for 71% of the gross income (not the net received).

11. Since 2016, Debtor and his family are barely surviving on his wife's salary alone of approximately $3400.00.

12. The enumerated expenses aforementioned, due not include the extraordinary medical expenses for both the Debtor and his son over the course of the year. These extraordinary personal medical expenses for Debtor fluctuated over the course of the year. Extraordinary personal medical expenses for Debtor were $254.00 monthly. In addition to those extraordinary expenses, Debtor's autistic son's expenses were an additional $83.33 per month when San Andreas Regional Center ("SARC") covered the cost of special education services.

Debtors subsidized assistance has since ended, and the couple were then forced to bear the burden of an additional $2,700.00 in costs for their son's special educational services.

13. As of 2021, Debtor's disposable income was negative, not including his wife's share of separate expenses. The couple's household disposable income appears to be negative as well. Consequently, the Debtor relies on family gifts to cover regular household expenses, medical bills for the Debtor, extraordinary medical and educational needs for his son, and any other unanticipated expenses.

14. To date, the Debtor is unemployable and remains unemployed, and Debtor's adjusted gross income is zero. The Debtor's family is presently ripe with disability. Debtor's son's disability needs have increased tremendously; 24-hour supervision, a role in which the Debtor has stepped into. Thus, the Debtor or his spouse is required to be at home with him full time, making a two-parent working home quite impossible. With the Debtor's spouse working, the situation is still very difficult and stressful on the family. Debtor's own disabilities have worsened to the point where he is not able to work, be it that his general functions are very low. Debtor's doctor has even gone as far as to recommend that he participate in experimental therapies, since traditional methods have failed.

15. Debtor's housing arrangements is also fragile and is contingent on his parent's health and life expectancy. The Debtor, his spouse, and his son were forced to move in with his parents to relieve financial responsibilities associated with rental and/or home ownership. Debtor's parents subsidize utilities and allow for Debtor and his family to live with them free of charge. Unfortunately, the health of Debtor's parents has deteriorated, leaving the future of Debtor's living arrangements and financial situation looming and unknown.

16. Debtor asserts that University breached its contracts by failing to deliver the pre-

licensure internships that he relied upon, which has led to 5 years of professional obstacles that he has sought to overcome. The 3,000 hours of clinical internship required to pursue the licensure is primarily strictly and customarily adhered is such that 1,500 internship hours is meant to have been obtained during school (pre-doctorial hours), and placement agencies such as Association for Professionals in Infection Control and Epidemiology ("APIC") and California Psychology Internship Council ("CAPIC") connect doctorial candidates with internship jobs, and in that process the internships require an educational institution to initiate the curriculum. While Debtor was attending University, he was placed in one pre-doctoral internship position, and subsequently ITP's administrators failed to initiate or assist Debtor with new placements for his pre-doctoral hours. ITP's administrators hindered Debtor's ability to obtain his internship placements due to politics and organizational problems which led to the closure of the school.

17. Recently, Debtor has actively sought to find out how to address his ITP career placement support promised debacle by reaching out to APIC and CAPIC to find a way to work around the school-initiated portion of their placement procedures. This notwithstanding, Debtor reasonably relied on obtaining this pre-doctoral internship hours prior to completing his PhD and has actively interviewed for positions, where he would be passed over due to the fact of not having at minimum the pre-doctoral internship hours.

18. Moreover, with respect to obtaining a PhD, Debtor could have left the educational institution with a master's degree in year 2007, however, the school administrators at the time were motivated by "financial constraints", which ended up being a publicly announced embezzlement, and urged the Debtor to pursue a PhD with the promise of an internship. An internship that would lead to licensure for the Debtor, which Debtor actively sought to manage at the time, but for the pressures of extending his enrollment and subsequently incurring additional

Adversarial Complaint to Dischargeability    11
*Molina v. US Department of Education*

Case: 22-05008    Doc# 6    Filed: 03/17/22    Entered: 03/17/22 20:44:31    Page 11 of 17

loans. This chain of events therefore contributed to the financial hindrance Debtor currently faces. Without Debtor being able to complete the required number of internship hours, Debtor is unlikely to ever earn a living in his field to be able to pay his total educational loan debt to Navient in the amount of $218,078.00, which is part of his total student loan debt of $653,731.00.

## III.

## THE MATERIAL FACTS OF THIS CASE UNIQUIVOCALLY ESTABLISH THAT DEBTOR WILL SUFFER UNDUE HARDSHIP AS DEFINED BY THE BANKRUPTCY CODE SHOULD HIS STUDENT LOANS BE DEEMED NON-DISCHARGEABLE

1. When considering an undue hardship claim under the Brunner three-prong test, for dischargeability of student loans, A debtor must show: "(1) that [he] cannot maintain, based on current income and expenses, a 'minimal' standard of living for [himself] and [his] dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that [he] has made good faith efforts to repay the loans."

2. The facts of this case establish that Debtor's student loans should be discharged because Debtor will suffer sever and undue hardship should he be required to repay these loans.

3. Within the first prong, here, Debtor simply cannot maintain, based on current income and expenses, a "minimal" standard of living for himself, his spouse and child if required to repay the loans. Debtor is currently unemployed, and his spouse's income alone cannot sustain the family. Assuming the best year income wise for Debtor's spouse is considered, their total income would be approximately $63,000 per year. Debtor's rental expenses alone amount to

$2,270.00 and there is an additional $1,630 per month for their son's special needs. Assuming even the lowest tax rate, said expenses would allow them no monies for food or clothing, something that they presently could not afford but for assistance from family. Moreover, assuming even a 2% interest rate on a $600,000 loan, such would necessitate that debtor pay an additional $2,173.00 were Debtor to pay off the $600,000 in 30 years. This does not take into account the fact that Debtor will reach retirement age in another 15 years. Needless to say, Debtor could not maintain even a minimal standard of living if required to pay back his student loan monies at a nominal rate of interest over a dramatically extended time. These facts satisfy the first prong of the test for undue hardship.

4. The second prong of the three-prong test for undue hardship requires Debtor to establish that additional circumstances exist which will render Debtor unable to pay the student loans back for an extended time into the payback period. Here, such circumstances exist in that Debtor has learning disabilities and is 53 years old. Debtor's learning disabilities will in fact remain with the Debtor for the rest of his life, thus rendering him effectively unemployable in his professional field. Moreover, Debtor's son who is now only eight years old will have to endure at least another 7 years of special needs educational costs (presently at the rate of $2,800 per month and is likely to increase) for his child. Therefore, the second prong of the test is met by Debtor.

5. The third prong of the test requires debtor to establish that good faith efforts were made to repay the loan. Here, Debtor's good faith efforts include obtaining deferments when necessary and seeking employment to the very best of his ability. In addition to this, his efforts to obtain employment, maximize income, and minimize expenses have been diligent and steadfast; living on Debtor's parents' property a reduced rent compared to market prices, seeking

employment whenever and wherever possible, and spending no money at all on what many in this area would consider items necessary to enjoy life. Moreover, Debtor has sought to negotiate a payment plan by seeking deferments where possible. It is only as of late, when Debtor has realized that it will be impossible for him to repay back the loans in dispute and maintain a minimum standard of living for his family, has he despaired of being able to repay said loans. Debtor has submitted loan forgiveness applications and they have been unsuccessful. More specifically, Debtor's past, present and likely-future reasonably reliable resources test establish that he qualifies for relief due to the undue hardship which Debtor and his family will have to endure if forced to pay back his student loans:

1. The first of three factors of the totality-of-circumstances test is to review a debtor's past, present, and reasonably reliably financial resources.
    i. [Past] Debtor tax returns from 2012 through 2020 (Married Filed Jointly), which illustrates that his average annual adjusted gross income was $35,175.20, or an average monthly adjusted gross income of $2,921.27, and Debtor received average annual tax refunds of $2,516.00 during that same period. Debtor's Spouse s average annual adjusted gross income was $38,197.40, or an average monthly adjusted gross income of $2,617.77. Debtor has already submitted his 2019 and 2022 tax return to the Trustee of the herein referenced Chapter 7 Bankruptcy filing, Case No. 21-51425.
    ii. [Present] Debtor filing a petition for Chapter 7 based on his

unemployment status, and even with Debtor's wife's income, it is not sufficient to pay household expenses without monthly gifts from family members. Debtor is unable to pay Defendant partial or full monthly payments.

  iii. [Future] To support Debtor's position that his reasonably [reliable] future income is no greater than his recent past, Debtor argues that his post graduate degrees in psychology do not provide him the requisite professional licensed credentials or experience to enable him to obtain a job paying more than he has earned in the past five years. He asserts that he had sent out more than 200 job résumés and job applications in an attempt to find full-time employment suitable positions that might also apply to the internship hours required for his professional license, but he has been unsuccessful. Debtor also notes he has experienced numerous career and financial setbacks, has been passed over on multiple job offers, including two layoffs from full-time jobs in the last ten years since he obtained his Doctorial degree, because he did not have a license in psychology.

2. The second factor of the totality-of-circumstances test is to review a debtor's reasonable and necessary living expenses. "To be reasonable and necessary, an expense must be 'modest and commensurate with the debtor's resources.'" Jesperson, 571 F.3d at 780 (quoting DeBrower v. Pa. Higher Educ. Assistance Agency (In re DeBrower), 387 B.R. 587, 590 (Bankr. N.D. Iowa 2008)). Here, and especially given the median incomes and costs of

living where Debtor lives, his living expenses are the epitome of reasonable and are also absolutely necessary.

3. Debtor and his spouse do not have sufficient medical insurance to pay for even a significant portion of their son's special education needs.

4. The bankruptcy court will find that Debtor's expenses are modest and commensurate with his and his spouse's resources. Any arguments will likely be based on Debtor's future income potential. The amount of student loan debt and the time that Debtor will take to complete his 1500 internship hours may not bring improvement to Debtor's future income to meet scheduled payments as they exist now, or within the next 10 years, or whichever time frame for which relief is sought.

5. The final factor in the totality-of-circumstances test requires consideration of any other facts and circumstances relevant to the undue hardship inquiry. Here, the medical expense for Debtor's autistic son, Debtor's unemployment condition and difficulty in gaining meaningful employment, amongst other reasons are major considerations to discharge the Debtor of his student loans.

6. Debtor contends (1) that he is unable to maintain the bare minimum standard of living if forced to repay the Loan, based on his lack of income, coupled with his spouse's current income and both of their expenses; (2) that his current health and financial status is likely to continue for a significant portion of the remaining payment period of the Loans; and (3) that he has made good faith efforts to repay the Loans.

7. Therefore, and for the reasons stated above and as will be established by the

overwhelming weight of evidence in this proceeding, Debtor's student loans should be deemed dischargeable and ultimately discharged pursuant to the Bankruptcy Code as applied to the facts of this case. Under 11 U.S.C. §523(a)(8), excepting the Loans from discharge would impose an undue hardship on Debtor and Debtor's family.

Wherefore, Debtor prays for relief as follows.

## IV.

## PRAYER

A. That under Rule 7001(6), Federal Rules of Bankruptcy Procedure, that the Loans be determined to be dischargeable pursuant to 11 U.S.C. §523(a)(8);

B. That under Rule 7001(9), Federal Rules of Bankruptcy Procedure, Debtor receives a declaratory judgment that the Loans are dischargeable under 11 U.S.C. §524(a); and

C. For such other relief as the Court may deem just.

Dated: March 17, 2022

By:＿＿/s/*Ronda N. Edgar*
**Ronda N. Edgar, Esq.**
Attorneys for Debtor and Plaintiff David S. Molina.